**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TOTAL FRIGHT PRODUCTIONS, LLC (D/B/A TOTAL PARTY),
429 L'Enfant Plaza SW, Suite 410,
Washington, DC 20024,

D4P RESTAURANT GROUP (D/B/A SPICEX XTRAORDINARY INDIAN KITCHEN),
429 L'Enfant Plaza SW, Suite 340,
Washington, DC 20024,

RJC JR LLC (D/B/A BROWN BAG L'ENFANT),
470 L'Enfant Plaza SW, Suite 830,
Washington, DC 20024,

*Plaintiffs*,

v.

SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development,
451 Seventh Street, SW
Washington, DC 20410,

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
451 Seventh Street, SW
Washington, DC 20410,

EDWARD C. FORST, in his official capacity as Administrator of the General Services Administration,
1800 F Street, NW
Washington, DC 20004,

GENERAL SERVICES ADMINISTRATION,
1800 F Street, NW
Washington, DC 20004,

UNITED STATES OF AMERICA,

*Defendants*.

Case No. __________

# AMENDED COMPLAINT

## ~~INTRODUCTION~~

1. Congress established the Department of Housing and Urban Development "at the seat of government" in Washington, D.C. 42 U.S.C. § 3532(a). Indeed, federal law provides that "*all* offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as expressly provided by law." 4 U.S.C. § 72 (emphasis added).

2. Consistent with these clear statutory commands, HUD has been headquartered in the Robert C. Weaver Building in Southwest Washington, D.C. since the agency's founding six decades ago. The General Services Administration (GSA) chose to build the Weaver Building in Southwest D.C. specifically to help redevelop that part of the District, in furtherance of HUD's mission of urban renewal. Since the Weaver Building opened in 1968, HUD's employees have in fact contributed significantly to the local economy, helping to transform and revitalize Southwest D.C. into a thriving neighborhood for the District's residents and businesses.

3. Beginning in April of this year, however, HUD Secretary Scott Turner began implementing a plan to relocate its headquarters from the Weaver Building to a new facility in Alexandria, Virginia. HUD and GSA have~~s~~ identified no statutory authority permitting the move, have~~s~~ failed to explain its abrupt departure from prior plans to remain in the Weaver Building, and have~~s~~ failed to provide any analysis underlying the claimed cost savings that they~~it~~ say~~s~~ prompted the move.

4. Plaintiffs are small businesses located just outside HUD's headquarters in Southwest D.C. For years, the thousands of HUD employees who worked in the Weaver Building shopped and ate at Plaintiffs' businesses, along with dozens of other businesses located in the L'Enfant Plaza shopping center located next to the Weaver Building. Now that HUD

employees have started to move out of its former headquarters, Plaintiffs and other businesses in the area have already suffered economic harm from the loss of customers, and will suffer additional irreparable harm if the planned move is completed later this year. They bring this action to require Defendants HUD to comply with the law and maintain HUD's the agency's headquarters in Washington, D.C., as Congress intended.

**PARTIES**

5. Plaintiff Total Fright Productions, LLC is a small business that owns and operates Total Party—a party, costume, and novelty store in L'Enfant Plaza, Washington, D.C.

6. Plaintiff D4P Restaurant Group is a small business that owns and operates SpiceX, an Indian restaurant in L'Enfant Plaza, Washington, D.C.

7. Plaintiff RJC JR LLC is a small business that owns and operates Brown Bag, a fast-casual restaurant serving breakfast and lunch in L'Enfant Plaza, Washington, D.C.

8. Defendant Scott Turner is the Secretary of the United States Department of Housing and Urban Development (HUD), the highest ranking official at HUD, and responsible for the decisions of HUD. He is sued in his official capacity.

9. Defendant Department of Housing and Urban Development is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

10. Defendant Edward C. Forst is the Administrator of GSA. He is sued in his official capacity.

11. Defendant GSA is an agency of the United States.

~~9.~~12. The United States of America is responsible for the exercise of executive actions by the named Defendants. The United States may be named as a defendant in any action seeking relief other than money damages against the United States. *See* 5 U.S.C. § 702.

**JURISDICTION AND VENUE**

~~10.~~13. This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

~~11.~~14. This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

~~12.~~15. Venue is appropriate in the District of Columbia pursuant to 28 U.S.C. § 1391(e).

**FACTUAL AND LEGAL BACKGROUND**

***HUD's Longstanding Headquarters in the District of Columbia***

~~13.~~16. The United States Department of Housing and Urban Development (HUD) is a federal cabinet-level agency responsible for national housing policy, community development, and ensuring access to affordable housing. HUD employees are responsible for critical programs that advance housing construction and preservation, rental assistance, affordable mortgage credit, and assistance for people who are experiencing homelessness.

~~14.~~17. HUD was established through the Department of Housing and Urban Development Act of 1965 (the HUD Act), Pub. L. No. 89-174, 79 Stat. 667 (1965). The HUD Act established HUD "at the seat of government" as an executive agency. *Id.* § 3(a), 79 Stat. at 667 (codified at 42 U.S.C. § 3532(a)).

~~15.~~18. In 1965, GSA~~the General Services Administration (GSA)~~ began construction on a new building to serve as HUD's headquarters at 451 7th St SW. The building was to be located

"on a narrow five and one half acre site in the Southwest Quadrant of Washington, DC, two blocks south of the National Mall." Quinn Evans/Architects & Oehrlein & Assocs. Architects, *Historic Structures Report: Housing and Urban Development (HUD) Building, Chapter I: Executive Summary* at 3 (July 1999).[1] GSA selected the building site specifically to be in a "designated redevelopment area in the city's Southwest quadrant," in furtherance of HUD's mission of urban renewal. *Robert C. Weaver Federal Building, Washington, DC*, GSA, https://perma.cc/CJ6M-RQ3R.

~~16.~~19. The building was designed by Marcel Breuer, "one of modern architecture's internationally recognized masters," in the "New Brutalism" style. *Historic Structures Report* at 3. Breuer designed the building in the shape of a "dog biscuit," with a "central core curving out to diagonal wings." *Id.*



[1]https://www.huduser.gov/portal//portal/sites/default/files/pdf/Historic-Structures-Report-Housing-and-Urban-Development-HUD-Building-Chapter-I-Executive-Summary.pdf.

~~17.~~20. In 1999, the HUD building was officially named to honor Dr. Robert C. Weaver for his service as the first African American cabinet member. The Weaver Building is listed in the National Register of Historic Places. Having been used by HUD continuously as its headquarters since it was completed in 1968, the building is "one of the most successful modern era buildings in GSA's inventory." *Robert C. Weaver Federal Building, Washington, DC*, GSA, https://perma.cc/CJ6M-RQ3R. The building "embodie[s]d the values promulgated by HUD itself," symbolically demonstrating the federal government's commitment to urban redevelopment across the nation." *Id.*

~~18.~~21. In 2022, HUD released its "Capital Plan" for 2024 to 2028, explaining how the agency intended to use its real property assets, including the Weaver Building, in years to come. HUD, *Capital Plan 2024-2028* (Dec. 16, 2022) https://perma.cc/CM6X-KUYP. The plan noted that HUD intended to "exercise a multi-year cost plan" to modernize and consolidate its various headquarter offices in Washington, D.C. "within the Weaver building." *Id.* at 43. The plan also proposed various capital improvements for the Weaver Building, with HUD requesting $5 million annually to modernize and maintain the building for future use. *Id.* at 44. Although the plan included a detailed "alternatives analysis," the plan did not propose relocating HUD's headquarters from the Weaver Building or suggest that staying in the Weaver Building would not be feasible. To the contrary, by proposing that HUD consolidate its various D.C. offices *in* the Weaver Building, the agency expressed an intent for the building to serve as its headquarters for years to come.

~~19.~~22. Consistent with its plans to stay at the Weaver Building long-term, in 2024, GSA proposed a $22 million alteration to the building to provide waterproofing, plumbing, and architectural and structural repairs in the parking garage, loading dock, and basement. *See* GSA,

FY 2025 Project Summary: Robert C. Weaver Federal Building, Washington, D.C. (2025), https://perma.cc/79NU-LXHC Again, the proposal expressly considered "alternatives" but concluded that there were "no feasible alternatives," as the renovation cost was "far less than the cost of leasing or constructing a new building." *Id.*

***HUD and GSA Abruptly Changes TheirIts Position and Announces HUD's Move to Virginia***

20.23. On June 25, 2025, HUD Secretary Scott Turner and GSA abandoned HUD'sthe agency's previously announced plans to renovate and remain in the Weaver Building, and instead abruptly announced that the agency planned to move its headquarters to Virginia. *HUD, GSA, and Governor of Virginia Announce HUD Relocation*, GSA, https://perma.cc/LL9U-J3MX (GSA June Announcement); *HUD Announces New Headquarters,* HUD, https://perma.cc/YC3K-2DQY (HUD June Announcement). Specifically, HUD announced that it would relocate its headquarters to a building then-occupied by the National Science Foundation (NSF), located in Alexandria, Virginia. The proposed move would require HUD to pay $26.2 million to relocate NSF employees, in addition to the costs of the move itself. *See* Sean Michael Newhouse, *Union and Lawmakers Criticize HUD's Handling of HQ Move as Questions Go Unanswered*, Gov't Exec. (Mar. 13, 2026), https://perma.cc/GK75-YZSA.

24. The announcement asserted without elaboration that the move would "unlock several hundred million dollars" in taxpayer savings, "enhance the Department's work culture," and address unnamed "health and safety" issues. *Id.*

21.25. GSA noted that the effort "mark[ed] the first cabinet level agency headquarters relocation of President Trump's Administration." GSA June Announcement. GSA stated that it was "proud to partner with Secretary Turner and [Virginia] Governor Youngkin" on the move. *Id.* GSA's announcement came after GSA had placed the Weaver Building on its "accelerated

disposition list," as part of an effort to "explore HUD's relocation options." *HUD and GSA Announce Collaborative Effort to Identify New Headquarters for U.S. Department of Housing and Urban Development*, GSA, https://perma.cc/368X-UNTK.

~~22.~~26. At a press conference accompanying the June announcement, Secretary Turner ~~likewise~~ cited generalized infrastructure and repair needs at the Weaver Building as the reason for the move. Neither Turner's remarks nor the HUD announcement discuss or provide any cost savings analysis data, explain how the move would improve work culture, or elaborate on purported health or safety issues.

~~23.~~27. In particular, the announcement asserts "several hundred million dollars" in savings, "nearly half a billion" in repairs, and "$22 million" in annual operations costs, but Defendants have not disclosed the underlying studies, assumptions, alternatives, timelines, or net relocation costs that justify those conclusions. *See* HUD June Announcement.

~~24.~~28. Neither HUD nor GSA has ~~continued to~~ offered any~~no~~ further explanation for their~~its~~ decision~~s, including failing to respond to Congressional oversight~~. In February 2026, Senators requested a Government Accountability Office review of the department's authority to relocate outside of the District of Columbia, how the department chose its new Virginia headquarters, and the potential impact on employees and the move's expenses. *Appropriators Call For Watchdog Review Of Hud HQ Move*, Politico (Feb. 13, 2026).[2] Senators stated that HUD failed to adequately inform Congress about HUD's budget analysis for choosing the National Science Foundation Building or explain why HUD was required to pay $26.2 million dollars to relocate NSF employees. *Id.* ("HUD continues to only provide piecemeal and partial responses to the [Appropriations] Committees as well as its own staff").

[2] https://www.politico.com/news/2026/02/13/hud-hq-move-virginia-00781230.

~~25.~~29. Notably, figures that HUD shared with the press are unsupported and conflict with prior GSA repair cost assessments. For instance, HUD defended the relocation on cost grounds to news outlets, arguing that the Weaver Building would require more than $609 million in repairs and upgrades to remain operational. But this estimate conflicts dramatically with the GSA's 2025 assessment that a $22.6 million repair would be sufficient to address the Weaver Building's repair needs. *See* GSA, FY 2025 Project Summary: Robert C. Weaver Federal Building, Washington, D.C. (2025), https://perma.cc/79NU-LXHC (noting that there are "no feasible alternatives to this project," and "the cost of the proposed project is far less than the cost of leasing or constructing a new building"). Indeed, GSA's planned $22.6 million renovation would be less than HUD's own estimated cost of $26.2 million to move NSF employees out of the Virginia building.

~~26.~~30. HUD and GSA have~~s~~ also failed to explain their ~~its~~ change in course from HUD's~~its~~ prior Capital Plan, which set forth a "multi-year cost plan" that would consolidate four Washington Satellite offices within the Weaver Building. HUD, *Capital Plan 2024-2028* (Dec. 16, 2022), https://perma.cc/CM6X-KUYP.

~~27.~~31. On March 11, 2026, senior leadership at HUD circulated a schedule for moving 20 HUD program offices to Alexandria, Virginia by April 10, 2026. On information and belief, that schedule listed all major programmatic offices, including the Office of the Secretary and Ginnie Mae, the Government National Mortgage Association.

~~28.~~32. On March 26, 2026, Maryland's two Senators, Chris Van Hollen and Angela Alsobrooks, sent a letter to HUD leadership again expressing opposition to and concern about the planned HUD headquarters move and its failure to consider federal law, the needs of HUD employees, and the administration of the nation's housing programs, additionally "expressing

deep concern that the move lacks legal justification." *Letter to Sec. Turner* (Mar. 26, 2026), https://perma.cc/NXL4-5EQP.

~~29.~~33. The union representing HUD's headquarters, the American Federation of Government Employees, (AFGE) Local 476, recently conducted a survey that indicates 77 percent of respondents oppose the relocation; 82 percent expect longer and more complex commutes; and nearly 20 percent indicate they may transfer, retire or resign within six months if the relocation proceeds.

~~30.~~34. HUD has already lost 30% of its staff since January 2025. Government Accountability Office, *Federal Agency Workforce Changes: Update for January to June 2025*, GAO26-108-719 (2026) https://www.gao.gov/products/gao-26-108719. The departure of an additional 20% of mission-critical staff would be catastrophic to the Department's ability to carry out its programs and respond to the nation's urgent housing affordability needs.

***HUD's Move Violates Clear Federal Law Requiring HUD to be Headquartered in Washington, D.C.***

~~31.~~35. HUD's proposed move outside of the District of Columbia is unlawful.

~~32.~~36. The Constitution's "District clause" bestows on Congress the exclusive power to govern the District of Columbia. As a result, the District of Columbia citizens receive no federal representation in Congress. U.S. CONST., art. 1, § 8, cl. 17.

~~33.~~37. This represents a compromise: "[t]he capital district was to be a national commons in which the representatives of the nation would govern the district with the federal interest at heart and in which, in exchange for federal patronage, the citizens of the district would surrender their suffrage." Whit Cobb, *Democracy in Search of Utopia: The History, Law, and Politics of Relocating the National Capital*, 99 Dickinson L. Rev 527 (1995).

~~34.~~38. James Madison, who proposed the District clause at the 1787 Constitutional Convention, argued in *The Federalist* No. 43 that "the gradual accumulation of public improvements at the stationary residence of government" would be "too great a public pledge to be left in the hands of a single state," and necessitated independence. The Federalist No. 43 at 279 (James Madison). Madison further predicted that wealth would be infused into the location chosen as the capital, proposing that "[t]he seat of government is of great importance, if you consider the diffusion of wealth that proceeds from this source." 1 Annals of Cong. 896 (1789).

~~35.~~39. Accordingly, the District of Columbia's very creation through the District clause represented a tradeoff. Although exclusive Congressional jurisdiction over the District was necessary to avoid interstate jealousies, Congress also intended to ensure that the residents of the district would not be harmed economically or politically by their lack of voting representation in Congress. *See* Cobb, 99 Dickinson L. Rev. at 528, 533 ("The Congress would receive absolute dominion over the capital district," and "[i]n exchange, the ceding state(s) would receive the capital's economic benefits").

~~36.~~40. On July 16, 1790, President George Washington signed Statute II (1 Stat. 130), which designated what is now known as Washington, DC, as the permanent seat of the United States government and required that all offices attached to the seat of government be located there. *See* 1 Stat. 253 (1789), codified at 4 U.S.C. §§ 71, 72. These requirements "cemented the compact's promise to the residents of the seat of government that they would benefit from economic development resulting from federal activities." *See* Cobb, 99 Dickinson L. Rev. at 538.

~~37.~~41. As codified, the relevant provisions (1) state that "[a]ll that part of the territory of the United States included within the present limits of the District of Columbia shall be the permanent seat of government of the United States," 4 U.S.C. § 71, and (2) direct that "all offices

attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law," 4 U.S.C. § 72.[3]

~~38.~~42. Accordingly, without statutory authorization, an executive agency cannot move its offices out of Washington, D.C. proper.[4] *See* L. Elaine Halchin, *Location of Federal Government Offices*, CRS Report for Congress (Jan. 28, 2003), https://perma.cc/9JSL-CNYF. HUD has received no such authorization. *See* 42 U.S.C. § 3532(a).

~~39.~~43. Rather, HUD's enacting statute explicitly establishes HUD "at the seat of government"—that is, within the limits of Washington, D.C. 42 U.S.C. § 3532(a) ("There is hereby established at the seat of government an executive department to be known as the Department of Housing and Urban Development."); 4 U.S.C. § 71.

~~40.~~44. Accordingly, Congress has provided clear directives, requiring HUD to maintain its headquarters in the District of Columbia, at the seat of government. First, 4 U.S.C. § 72 requires that HUD's headquarters as an executive agency be located in the District of Columbia, absent express statutory authorization. Second, HUD's own authorizing statute establishes HUD at the seat of government, both disclaiming any authority to move the agency's headquarters from the District of Columbia and creating an independent requirement under the authorizing statute that HUD be located in the District of Columbia. 42 U.S.C. § 3532(a).

---

[3] The 1790 legislation was codified in 1873 and recodified in 1947. *See* 4 U.S.C. §§ 71, 72.

[4] At minimum, the statute applies to the headquarters of executive agencies. *See id.* HUD is an executive agency. *See* 5 U.S.C. § 105; 42 U.S.C. § 3532(a) (establishing HUD "at the seat of government [as] an executive department" of the United States).

***Plaintiffs Have Suffered and Will Continue to Suffer Harm If HUD Relocates to Virginia As Planned***

~~41.~~45. For decades, thousands of HUD employees who work out of the Weaver Building have been a vital part of the local Southwest D.C. economy, frequenting local restaurants and shops, including the restaurants and shops at the neighboring L'Enfant Plaza.

~~42.~~46. Plaintiffs are three small businesses located in L'Enfant Plaza who have already suffered significant harm from HUD's unlawful efforts to move employees out of its headquarters in D.C., and who will face potentially existential harm if the proposed move is completed and made permanent.

~~43.~~47. Plaintiff Total Fright Productions, LLC (Total Party) is a small business that operates a party, costume, and novelty store in L'Enfant Plaza adjacent to the Weaver Building. Total Party opened its first store in Georgetown in 2007, but moved to L'Enfant Plaza at the beginning of 2025 because of the large number of federal employees who worked in the area, including specifically at HUD.

~~44.~~48. Since HUD began moving its employees to the new Alexandria location in April 2026, Total Party has seen a sharp decline in the number of customers visiting the store. Because of the decreased demand, the business has had to reduce its hours. Although the store has so far been able to survive the departure of thousands of nearby office workers in part due to the many tourists who visit L'Enfant Plaza in the summer months, it is concerned that it will not be able to survive long-term, especially once there are fewer tourists visiting L'Enfant Plaza. Total Party is particularly concerned about its long-term ability to stay at L'Enfant Plaza if the HUD move is made permanent given that new businesses are not signing leases in the area due to HUD's announced departure.

~~45.~~49. Plaintiff D4P Restaurant Group (SpiceX) is another small business that operates an Indian restaurant in L'Enfant Plaza. Like Total Party, SpiceX moved to L'Enfant Plaza about three years ago largely because of HUD's and other federal agencies' presence in Southwest DC. In the months since HUD began transitioning employees to the Alexandria office, SpiceX has seen a decline in its sales, and at one point fell behind on its rent payments due to the loss of customers. If customers and sales continue to decline as expected if the HUD move is completed, SpiceX's owner fears that he will have to lay off staff or close the business.

~~46.~~50. Plaintiff RJC JR LLC is also a small business that operates Brown Bag, a fast-casual restaurant serving breakfast and lunch in L'Enfant Plaza. The business opened in L'Enfant Plaza in 2014, and the owner chose the location specifically to service the employees who worked near L'Enfant Plaza, including at HUD. Brown Bag's business has also already been significantly impacted by HUD's move, with April and May revenues down about 20% compared to the prior year. Brown Bag's owner fears that he will not survive the upcoming fall and winter months given the decline in customers.

~~47.~~51. Each of the Plaintiff businesses chose to open in L'Enfant Plaza because of the economic opportunity provided by HUD's presence. Each business owner believed, reasonably, that HUD would maintain its headquarters in the District for years to come, consistent with its prior representations and the law. And each business owner now fears that they will not be able to survive if HUD completes its planned unlawful move out of the District. Plaintiffs bring this action to require Defendants ~~HUD~~ to comply with the law.

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act—Contrary to Law

~~48.~~52. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

~~49.~~53. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2).

~~50.~~54. The decision to move HUD's agency headquarters outside of the District of Columbia is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

~~51.~~55. Under 4 U.S.C. § 72, "all offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law."

~~52.~~56. HUD's enacting statute explicitly establishes HUD "at the seat of government." 42 U.S.C. § 3532(a) ("There is hereby established at the seat of government an executive department to be known as the Department of Housing and Urban Development.").

~~53.~~57. Neither HUD's enacting statute nor any other law "expressly provid[es]" that HUD may be located outside of the District of Columbia.

~~54.~~58. Accordingly, Defendants'~~HUD's~~ decision to move HUD's ~~its~~ headquarters to Virginia violates the requirement under 4 U.S.C. § 72 that HUD's headquarters be located in the District of Columbia. It also violates HUD's enacting statute, which establishes HUD "at the seat of government." 42 U.S.C. § 3532(a).

~~55.~~59. Defendants' conduct is contrary to law, and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

**Count II**
**Violation of the Administrative Procedure Act—Arbitrary and Capricious**

~~56.~~60. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

~~57.~~61. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

~~58.~~62. The decision to move HUD's headquarters is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

~~59.~~63. Defendants have failed to adequately justify their action; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

~~60.~~64. In deciding to move HUD's agency headquarters, Defendants have failed to consider multiple important aspects of the problem. For instance, Defendants failed to consider the serious reliance interests of small businesses such as Plaintiffs who signed leases in or around L'Enfant Plaza because of HUD's presence or the HUD employees who bought houses or signed leases to rent based on HUD's location in Southwest DC. Defendants failed to consider the effect that a move would have on the Southwest DC economy. And Defendants failed to seriously consider reasonable alternatives, including moving to a different building in the District of Columbia.

**PRAYER FOR RELIEF**

1. Declare unlawful, vacate, and set aside Defendants' decision to move HUD's agency headquarters outside of Washington, D.C.

2. Stay Defendants' decisions to move HUD's agency headquarters, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

3. Enjoin Defendants from implementing or giving effect to Defendants' decisions to move HUD's agency headquarters;

4. Issue a writ of mandamus compelling Defendants to carry out their clear duties, if complete relief is not available under Plaintiffs' other claims;

5. Award Plaintiffs reasonable attorneys' fees and costs; and

6. Grant such other and further relief as the Court may deem just and proper.

August 27~~June #29~~, 2026

Respectfully submitted,

*/s/ Lynn D. Eisenberg*
Lynn D. Eisenberg (DC Bar No. 1017511)
Daniel F. Jacobson (DC Bar No. 1016621)
John Robinson (DC Bar No. 1044072)
Nina C. Cahill (DC Bar No. 1735989)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
lynn@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*