**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOTAL FRIGHT PRODUCTIONS, LLC (D/B/A TOTAL PARTY), *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development, *et al.*, | Case No. 26-2304 |
| DISTRICT OF COLUMBIA,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants*. | Case No. 26-2636 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT ONE (CONTRARY TO LAW)**

## TABLE OF CONTENTS

INTRODUCTION ....................1

BACKGROUND ....................2

A. Congress Establishes HUD at the Seat of Government ....................2

B. HUD's Longstanding Headquarters in the Weaver Building....................3

C. HUD and GSA Announce HUD's Move to Virginia....................5

D. Plaintiffs Have Suffered and Will Continue to Suffer Harm if HUD Relocates to Virginia As Planned ....................7

E. Procedural History....................9

LEGAL STANDARD....................9

ARGUMENT....................10

I. HUD'S RELOCATION IS CONTRARY TO LAW ....................10

II. THE COURT SHOULD ENTER MULTIPLE FORMS OF RELIEF ....................13

CONCLUSION....................16

## TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. C.A.B.*,
713 F.2d 795 (D.C. Cir. 1983) ........ 16
*Alameda Cnty. Med. Ctr. v. Leavitt*,
559 F. Supp. 2d 1 (D.D.C. 2008) ........ 11
*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ........ 15
*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
64 F.4th 1354 (D.C. Cir. 2023) ........ 16
*Austin v. Wash. Metro. Area Transit Auth.*,
No. 19-cv-2718, 2020 WL 2962609 (D.D.C. May 28, 2020) ........ 10
*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) ........ 15
*C.G.B. v. Wolf*,
464 F. Supp. 3d 174, 218 (D.D.C. 2020) ........ 16
*D.A.M. v. Barr,*
474 F. Supp. 3d 45, 67 (D.D.C. 2020) ........ 16
*Data Mktg. P'ship, LP v. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) ........ 16
*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ........ 17
*Griffin v. HM Fla.-ORL, LLC*,
144 S. Ct. 1 (2023) ........ 16
*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
478 U.S. 221 (1986) ........ 11
*Joe Hand Promotions, Inc. v. Molly Malone's LLC*,
No. 19cv-3479, 2020 WL 5816219 (D.D.C. Sept. 30, 2020) ........ 10
*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 18
*Maryland v. Patel*,
No. CV 25-3644-TDC, 2026 WL 2389783 (D. Md. Aug. 17, 2026) ........ 13, 14, 15, 16, 17, 18

*Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*,
793 F. Supp. 3d 166, 197 (D.D.C. 2025) ........ 15

*Nat'l Council of Nonprofits v. OMB*,
763 F. Supp. 3d 36, 56 (D.D.C. 2025) ........ 15

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ........ 17

Order, *District of Columbia v. HUD*,
No. 26-cv-2304 (D.D.C. Aug. 7, 2026) ........ 9

*United States v. Trucking Mgmt., Inc.*,
28 Fed. R. Serv. 2d 839 (D.D.C. 1979) ........ 11

**Statutes**

4 U.S.C. § 71 ........ 2, 12

4 U.S.C. § 72 ........ 1, 2, 10, 11, 14

5 U.S.C. § 706(2) ........ 10, 11, 15

7 U.S.C. § 2201 ........ 12

15 U.S.C. § 1501 ........ 12

22 U.S.C. § 2651 ........ 12

28 U.S.C. § 501 ........ 12

29 U.S.C. § 558 ........ 12

31 U.S.C. § 301 ........ 12

35 U.S.C. § 1(b) ........ 13

38 U.S.C. § 314 ........ 12

42 U.S.C. § 3532(a) ........ 1, 3, 10, 12, 14

42 U.S.C. § 7131 ........ 12

43 U.S.C. § 1451 ........ 12

Act of July 16, 1790, ch. 26, § 1, 1 Stat. 130 ........ 2

Department of Housing and Urban Development Act of 1965 (HUD Act),
Pub. L. No. 89-174, § 3(a), 79 Stat. 667, 667 (1965) ........ 3

First Supplemental National Defense Appropriation Act, 1942,
Pub. L. No. 77-247, 55 Stat. 669, 685-86 (1941) ........ 13

Act of July 15, 1955, Pub. L. No. 84-161, § 401, 69 Stat. 324, 349 ........ 13

**Rules**

Fed. R. Civ. P. 56(a) ........ 11

Fed. R. Civ. P. 56(b) ........ 10

Fed. R. Civ. P. 57 ........ 16

**U.S. Constitution**

U.S. Const. art. 1, § 8, cl. 17 ........ 2

**Other Authorities**

The Federalist No. 43 (Madison) ........ 3

Whit Cobb, *Democracy in Search of Utopia*: *The History, Law, and Politics of Relocating the National Capital*, 99 Dickinson L. 527, 528 (1995) ........ 3

## INTRODUCTION

This case concerns the unlawful relocation of the Department of Housing and Urban Development's headquarters from the Robert C. Weaver Building in Southwest Washington, D.C., to a building outside of the District in Alexandria, Virginia.

Federal law is clear. Since the Residence Act of 1790, Congress has required that "all offices attached to the seat of government" be "exercised in the District of Columbia" unless Congress "expressly provided" otherwise. 4 U.S.C. § 72. And when Congress created HUD in 1965, it established the agency "at the seat of government." 42 U.S.C. § 3532(a). Consistent with these statutory requirements, HUD has always maintained its headquarters in the District.

In April of this year, however, Defendants began implementing a plan to relocate the agency's headquarters from the Weaver Building to a new facility in Virginia. In doing so, Defendants have ignored the clear statutory commands in the Residence Act and HUD's organic statute. Plaintiffs are three of the many small businesses who moved to L'Enfant Plaza in reliance on HUD's continued presence in the Weaver Building. Plaintiffs have already suffered economic harm from the loss of customers now that HUD employees have started to move out of the agency's headquarters and will continue to suffer harm from Defendants' unlawful actions.

Plaintiffs bring this action to require HUD to comply with the law and maintain the agency's headquarters in Washington, D.C. Plaintiffs now move for partial summary judgment on Count One of their Amended Complaint, which alleges that Defendants' decision to relocate HUD's headquarters to Virginia is contrary to law. Because there are no disputes of material fact

and Plaintiffs are entitled to judgment as a matter of law, the Court should grant Plaintiffs' motion for partial summary judgment on this claim.[1]

## BACKGROUND

### A. Congress Establishes HUD at the Seat of Government

The Constitution's "District Clause" bestows on Congress the exclusive power to govern the District of Columbia. U.S. Const. art. I, § 8, cl. 17. Pursuant to its power under the District Clause, Congress in 1790 passed the Residence Act, establishing the District of Columbia as the "permanent seat of the government of the United States." Act of July 16, 1790, ch. 26, § 1, 1 Stat. 130. As originally enacted, the Residence Act directed that "the seat of the government of the United States shall . . . be transferred to the [District of Columbia]," and "all offices attached to the said seat of government, shall accordingly be removed thereto by their respective holders and shall . . . cease to be exercised elsewhere." *Id.* § 6, 1 Stat. 130.

The Residence Act has remained the law of the land for over 230 years. As presently codified, the Act states that "[a]ll that part of the territory of the United States included within the present limits of the District of Columbia shall be the permanent seat of government of the United States," 4 U.S.C. § 71, and directs that "all offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law," 4 U.S.C. § 72.

The establishment of Washington, D.C., as the permanent seat of government represented a compromise for the District and its residents. *See* Whit Cobb, *Democracy in Search of Utopia*: *The History, Law, and Politics of Relocating the National Capital*, 99 Dick. L.

[1] As explained below, the Amended Complaint also asserts in Count Two that the decision to relocate HUD to Virginia is arbitrary and capricious. Plaintiffs intend to seek summary judgment on that claim, if necessary, after Defendants have produced an administrative record.

527, 528 (1995). District residents were required to "surrender their suffrage," but, "in exchange," District residents would benefit from "federal patronage," ensuring that "residents of the district would not be harmed economically by their lack of voting representation in Congress." *Id.* As James Madison explained in *The Federalist Papers*, the economic benefits that would come from centralizing the federal government in the District would serve as "inducements of interest" for District residents to "become willing parties to the cession" of state land to the District. The Federalist No. 43 (Madison).

Consistent with the Residence Act, until this year, every federal agency whose offices are attached to the "seat of government"—including HUD—has maintained its headquarters in the District. Congress has never "expressly provided" for HUD's headquarters to be located elsewhere. To the contrary, when Congress created HUD in 1965, it expressly established the agency "at the seat of government"—*i.e.*, in Washington, D.C. *See* Department of Housing and Urban Development Act of 1965 (HUD Act), Pub. L. No. 89-174, § 3(a), 79 Stat. 667, 667 (1965) (codified at 42 U.S.C. § 3532(a)).

**B. HUD's Longstanding Headquarters in the Weaver Building**

Shortly after the HUD Act was enacted, the General Services Administration (GSA) began constructing a new building to serve as HUD's headquarters at 451 7th St SW in Washington, D.C. *See Robert C. Weaver Federal Building, Washington, DC*, GSA (Ex. 1).[2] GSA selected the building site specifically to be in a "designated redevelopment area in the city's Southwest quadrant," in furtherance of HUD's mission of urban renewal. *Id.* Since construction was completed six decades ago in 1968, the HUD building—now known as the Robert C. Weaver Building—has served continuously as HUD's headquarters. *Id.* According to GSA, the

[2] All exhibit citations are to exhibits attached to the Declaration of Lynn Eisenberg.

building has "symbolically demonstrat[ed] the federal government's commitment to urban redevelopment across the nation," and has served as "one of the most successful modern-era buildings in GSA's inventory." *Id.* The building "embodie[s] the values promulgated by HUD itself," and is listed in the National Register of Historic Places. *Id.*

The placement of HUD's headquarters in Southwest D.C. brought thousands of federal employees to the area. Over time, those employees helped to revitalize Southwest D.C. into a thriving neighborhood for the District's residents and businesses. L'Enfant Plaza was built adjacent to HUD and was opened to the public in the same year. *See* Abha Bhattari, *L'Enfant Plaza Opens Monday After $40 Million Makeover*, Wash. Post, June 1, 2014 (Ex. 2).

Before the most recent change in administration, neither HUD nor GSA suggested that HUD might move its headquarters out of the Weaver Building. To the contrary, as recently as 2022, HUD released a detailed "Capital Plan," explaining how the agency intended to use its real property assets, including the Weaver Building, for years to come. HUD, *Capital Plan 2024 through 2028* (Dec. 16, 2022) (Ex. 3). The plan stated that HUD intended to execute a multi-year plan to modernize and consolidate its various headquarters offices in Washington, D.C., "within the Weaver building." *Id.* at 43. The plan also proposed various capital improvements for the Weaver Building, with HUD requesting $5 million annually to modernize and maintain the building for future use. *Id.* at 44. Although the plan included a detailed "alternatives analysis," the plan did not propose relocating HUD's headquarters from the Weaver Building or suggest that staying in the Weaver Building would not be feasible.

Consistent with its plans to stay at the Weaver Building long-term, in 2024, GSA proposed a $22 million alteration to the building to provide waterproofing, plumbing, and architectural and structural repairs in the parking garage, loading dock, and basement. GSA, FY

2025 Project Summary: Robert C. Weaver Federal Building, Washington, D.C. (2024) (Ex. 4). Again, the proposal expressly considered "alternatives" but concluded that there were "no feasible alternatives," as the renovation cost was "far less than the cost of leasing or constructing a new building." *Id.*

**C. HUD and GSA Announce HUD's Move to Virginia**

Even before taking office in January 2025, then-candidate Trump pledged that if he were re-elected, he would "shatter the deep state" by moving federal agencies from Washington, D.C. to parts of the country that are "filled with patriots who love America." Joe Davidson, *Trump's Second-Term Agenda Plans a Purge of the Federal Workforce*, Wash. Post, July 26, 2025 (Ex. 5). To that end, shortly after the change in administration, Office of Management and Budget Director Russ Vought issued guidance to implement President Trump's "Department of Government Efficiency Workforce Optimization Initiative." *See* Memo. from Russell T. Vought, Director, OMB, and Charles Ezell, Acting Director, Office of Personnel Management, Guidance on Agency RIF and Reorganization Plans (Feb. 26, 2025) (Ex. 6). The guidance directed federal agencies to submit "[a]ny proposed relocations of agency bureaus and offices" to the White House Office of Management and Budget by April 14, 2025. *Id.* at 4–5.

Shortly thereafter, on April 17, 2025, HUD and GSA announced a "collaborative effort" to identify a new headquarters for HUD. *See HUD and GSA Announce Collaborative Effort to Identify New Headquarters for U.S. Department of Housing and Urban Development* (Ex. 7). GSA added the Weaver Building to its "accelerated disposition list" to "allow the GSA to more effectively right size the federal real estate portfolio." *Id.* GSA noted that HUD's relocation was part of "the Trump Administration's broader strategy to streamline federal operations" and "eliminate waste." *Id.*

Two months later, on June 25, 2025, HUD and GSA formally announced plans to move HUD's headquarters to Virginia. *See* GSA, *HUD, GSA, and Governor of Virginia Announce HUD Relocation* (Ex. 8). Specifically, HUD announced that it would relocate its headquarters to a building then-occupied by the National Science Foundation (NSF), located in Alexandria. The proposed move would require HUD to pay $26.2 million to relocate NSF employees, in addition to the costs of the move itself. *See* Letter from Sens. Kirsten Gillibrand, Jack Reed, and Chris Van Hollen to Orice Williams Brown, Acting Comptroller General of the United States (Feb. 13, 2026) (Senators' GAO Letter) (Ex. 9). Virginia Governor Glenn Youngkin praised the decision, noting that "Virginia is a great place to be headquartered" and that he was "excited to welcome the Department of Housing and Urban Development and their over 2,700 headquarters-based employees to" Virginia. *Id.* He also recognized the extraordinary circumstances surrounding the move, noting that "It's not every day—in fact, I don't think it's been ever—that a federal, cabinet-level agency has moved its headquarters to Virginia."[3]

HUD's proposed relocation quickly drew scrutiny from Congress. In February 2026, Senators Gillibrand, Reed, and Van Hollen requested a Government Accountability Office review of HUD's authority to relocate outside of the District of Columbia, noting that federal statutes require the agency to remain in the District. *See* Senators' GAO Letter, Ex. 9. The Senators noted that HUD had failed to inform Congress about HUD's budget analysis for choosing the National Science Foundation Building. *Id.* Similarly, in March 2026, Senators Van Hollen and Alsobrooks sent a letter to HUD leadership again expressing opposition to and concern about the planned HUD headquarters move and its failure to consider federal law, the

[3] HUDchannel, Live: The New Golden Age of HUD | Secretary Turner Unveils HUD's New Building (YouTube, June 25, 2025), https://www.youtube.com/watch?v=ZdctWVC7LQM (2:58–3:08).

needs of HUD employees, and the administration of the nation's housing programs. *See* Letter from Sens. Chris Van Hollen, Angela Alsobrooks, and Elizabeth Warren to Sec'y Scott Turner (Mar. 26, 2026) (Ex. 10). The authors also expressed "deep concern that the move lacks legal justification." *Id.*

On March 11, 2026, senior leadership at HUD circulated a schedule to move 20 HUD program offices to Alexandria, Virginia. *Id.* That schedule listed all major programmatic offices, including the Office of the Secretary and Ginnie Mae, the Government National Mortgage Association. *Id.* According to a recent survey, the vast majority of HUD employees oppose relocating to Virginia, citing longer and more difficult commutes. *Id.* Twenty percent of survey respondents indicated that they may transfer, retire, or resign within six months if the relocation is made permanent. *Id.*

**D. Plaintiffs Have Suffered and Will Continue to Suffer Harm if HUD Relocates to Virginia As Planned**

Plaintiffs are three small businesses located in L'Enfant Plaza who have already suffered significant harm from HUD's unlawful efforts to move HUD's headquarters outside of D.C., and who will face potentially existential harm if the proposed move is completed and made permanent.

Plaintiff Total Fright Productions, LLC (Total Party) is a small business that operates a party, costume, and novelty store in L'Enfant Plaza adjacent to the Weaver Building. Declaration of Lorenzo Caltagirone (Caltagirone Decl.) ¶ 1. Total Party opened its first store in Georgetown in 2007, but moved to L'Enfant Plaza at the beginning of 2025 because of the large number of federal employees who worked in the area, including specifically at HUD. *Id.* ¶¶ 3–4. Since HUD began its relocation earlier this year, Total Party has seen a sharp decline in the number of customers visiting the store. *Id.* ¶ 8. Its sales have declined compared to last year, and if the trend

continues, it will need to furlough or lay off staff. *Id.* ¶ 9. It is also concerned that the business will not be able to survive long-term if the HUD move is made permanent. *Id.* ¶ 10.

Plaintiff D4P Restaurant Group (SpiceX) is another small business that operates an Indian restaurant in L'Enfant Plaza. Declaration of Pramesh Shrestha (Shrestha Decl.) ¶ 1. Like Total Party, SpiceX moved to L'Enfant Plaza about three years ago largely because of HUD's and other federal agencies' presence in Southwest D.C. *Id.* ¶ 4. In the months since HUD began transitioning employees to the Alexandria office, SpiceX has seen a decline in its sales, and at one point fell behind on its rent payments due to the loss of customers. *Id.* ¶ 5. If customers and sales continue to decline as expected if the HUD move is completed, SpiceX's owner fears that he will have to lay off staff or close the business. *Id.* ¶ 6.

Plaintiff RJC JR LLC is also a small business that operates Brown Bag, a fast-casual restaurant serving breakfast and lunch in L'Enfant Plaza. Declaration of Robert J. Cunius, Jr. (Cunius Decl.) ¶ 1. The business opened in L'Enfant Plaza in 2014, and the owner chose the location specifically to service the employees who worked near L'Enfant Plaza, including at HUD. *Id.* ¶ 2. Brown Bag's business has also already been significantly impacted by HUD's move, with April–August revenues down 20–40% compared to the prior year. *Id.* ¶ 4. Due to this decline, the restaurant currently is not profitable, and if the current trend continues, it will need to lay off one of its four employees. *Id.* ¶ 6. Brown Bag's owner also fears that he will not survive the upcoming fall and winter months given the decline in customers. *Id.* ¶ 6.

Each of the Plaintiff businesses chose to open in L'Enfant Plaza because of the economic opportunity provided by HUD's presence. Caltagirone Decl. ¶ 11; Shrestha Decl. ¶ 8; Cunius Decl. ¶ 7. Each business owner believed, reasonably, that HUD would maintain its headquarters in the District for years to come, consistent with its prior representations and the law. Caltagirone

Decl. ¶ 11; Shrestha Decl. ¶ 8; Cunius Decl. ¶ 7. And each business owner now fears that they will not be able to survive if HUD completes its planned unlawful move out of the District. Caltagirone Decl. ¶ 10; Shrestha Decl. ¶ 8; Cunius Decl. ¶ 8.

### E. Procedural History

Plaintiffs filed their complaint on June 29, 2026. On July 27, 2026, the District of Columbia filed its own complaint challenging HUD's relocation, and the Court thereafter consolidated the two cases. *See* Order, *District of Columbia v. HUD*, No. 26-cv-2304 (D.D.C. Aug. 7, 2026), Dkt. 8. Plaintiffs in this case then filed an amended complaint on August 27, 2026, adding GSA, the GSA Administrator, and the United States as Defendants. *See* Dkts. 1, 9.

Count One of the amended complaint alleges that HUD's relocation to Virginia is contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2). Specifically, Plaintiffs allege that HUD's relocation violates 4 U.S.C. § 72, which requires that "all offices attached to the seat of government . . . be exercised in the District of Columbia," and 42 U.S.C. § 3532(a), which establishes HUD "at the seat of government." Compl. ¶¶ 51–52.

Count Two of the amended complaint alleges that Defendants' decision to relocate HUD to Virginia was arbitrary and capricious, also in violation of Section 706(2) of the Administrative Procedure Act. Plaintiffs allege that Defendants failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake. *Id.* ¶ 59. Defendants have also unlawfully relied on factors that Congress did not authorize them to consider, and have failed to acknowledge or justify their change in position. *Id.*[4]

[4] As noted, Plaintiffs are not moving for summary judgment on Count Two at this time.

## LEGAL STANDARD

"[A] party may move for summary judgment 'at any time,' including at the beginning of a case." *Joe Hand Promotions, Inc. v. Molly Malone's LLC*, No. 19cv-3479, 2020 WL 5816219, at *3 (D.D.C. Sept. 30, 2020) (quoting *Austin v. Wash. Metro. Area Transit Auth.*, No. 19-cv-2718, 2020 WL 2962609, at *7 (D.D.C. May 28, 2020)); *see* Fed. R. Civ. P. 56(b). Summary judgment should be granted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. HUD'S RELOCATION IS CONTRARY TO LAW

Under the Administrative Procedure Act, a reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2). Federal agencies—including HUD and GSA—"may not act contrary to the will of Congress." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 233 (1986); *see United States v. Trucking Mgmt., Inc.*, 28 Fed. R. Serv. 2d 839 (D.D.C. 1979) ("[T]he executive branch may not exercise its authority, derived from Congress, in a manner inconsistent with the implied or expressed will of Congress."), *aff'd*, 662 F.2d 36 (D.C. Cir. 1981); *Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 5 (D.D.C. 2008) ("The Executive must comply with the duly enacted commands of Congress.").

Congress could not have been clearer that HUD must maintain its headquarters in the District of Columbia. First, in the Residence Act, Congress required that "all offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law." 4 U.S.C. § 72. Second, in HUD's organic statute, Congress expressly established HUD "at the seat of government." 42 U.S.C. § 3532(a); *see* 4

U.S.C. § 71 (the District of Columbia is "the permanent seat of government"). Thus, not only has Congress never authorized HUD to relocate its headquarters outside the District (as would be required to relocate under the Residence Act), but Congress has expressly and unequivocally required that HUD *specifically* be headquartered in the District.

In requiring HUD to be headquartered in the District, Congress used the same language that it has used in other statutes to require federal agencies to be headquartered in the District. Congress has established the Departments of Agriculture, Commerce, Energy, the Interior, Justice, State, and Treasury "at the seat of government." *See* 7 U.S.C. § 2201; 15 U.S.C. § 1501; 42 U.S.C. § 7131; 43 U.S.C. § 1451; 28 U.S.C. § 501; 22 U.S.C. § 2651; 31 U.S.C. § 301. Congress has likewise required the Department of Veterans Affairs and the Department of Labor to be headquartered in "the District of Columbia." 38 U.S.C. § 314; 29 U.S.C. § 558. Consistent with these requirements, all of these agencies have been headquartered in the District since their establishment, and have remained headquartered in the District to this day.

Where Congress has authorized a federal agency to be headquartered outside the District, it has "expressly provided" for that result, consistent with the Residence Act. For example, in 1941, Congress authorized the War Department to construct a headquarters that would become the Pentagon on "the site formerly occupied by the Department of Agriculture Experimental Farm and land adjacent thereto in Arlington County, Virginia." 1st Suppl. Nat'l Defense Approps. Act, 1942, Pub. L. No. 77-247, 55 Stat. 669, 685–86 (1941). In 1955, Congress expressly authorized the CIA Director to install the agency's headquarters "at Langley, Fairfax County, Virginia." Act of July 15, 1955, Pub. L. No. 84-161, § 401, 69 Stat. 324, 349. That same year, Congress authorized the Atomic Energy Commission to construct a headquarters "in or near the District of Columbia," and the Commission is now headquartered in Germantown,

Maryland. Act of May 6, 1955, Pub. L. No. 84-31, 69 Stat. 47, 47; *see also, e.g.*, 35 U.S.C. § 1(b) (authorizing the Patent and Trademark Office to maintain its principal office in "the metropolitan Washington, D.C. area").

More recently, Congress directed the FBI to relocate its headquarters to one of three sites in Maryland or Virginia. *See Maryland v. Patel*, No. CV 25-3644-TDC, 2026 WL 2389783, at *14 (D. Md. Aug. 17, 2026). In the 2022 and 2023 Appropriations Acts, Congress directed GSA to select a site for the FBI's headquarters from "one of the three listed in [GSA's] Fiscal Year 2017 . . . prospectus," *i.e.*, Greenbelt, Maryland; Landover, Maryland; or Springfield, Virginia. *Id.* A federal court recently held that these statutory mandates "preclude[d] GSA from choosing a different site" and that the FBI's decision to move its headquarters to the Ronald Reagan Building in Washington, D.C. "exceeded its statutory authority." *Id.* The court accordingly vacated the FBI's decision to relocate to the Reagan Building. *Id.* at *20.

Here, just as in *Maryland v. Patel*, Defendants have exceeded their statutory authority in deciding to relocate HUD's headquarters in contravention of the Residence Act and HUD's organic statute. Unlike in the cases of the FBI or Department of Defense, Congress has never "expressly provided" for HUD to be headquartered outside the District. Thus, under the Residence Act and HUD's organic statute, HUD must maintain its headquarters "in the District of Columbia." 4 U.S.C. § 72; *see also* 42 U.S.C. § 3532(a) (establishing HUD "at the seat of government").

Defendants have never provided *any* justification for ignoring these statutory requirements. Nor could they. Indeed, the requirement that federal agencies be headquartered in the District has been hotly debated in Congress. Those who oppose the requirement that federal agencies be headquartered in the District have thus tried to repeal or modify the Residence Act.

For example, in 2023, Representative Warren Davidson introduced the "Drain the Swamp Act," which sought to "repeal" 4 U.S.C. § 72 and allow federal agencies to locate their headquarters outside of the District. *See* Drain the Swamp Act of 2023, H.R. 978, 118th Cong. (2023).[5] Similarly, in 2017, Representative Chaffetz introduced a resolution "expressing the sense of the House of Representatives that offices attached to the seat of Government should not be required to exercise their offices in the District of Columbia," while recognizing that "section 72 of title 4 . . . requires all offices attached to the seat of Government to be exercised in the District of Columbia." *See* H. Res. 38, 115th Cong. (2017).[6] But Congress did not pass either of these proposals. The Residence Act remains the law to this day.

Accordingly, there can be no serious dispute that Defendants exceeded their statutory authority and acted contrary to law in deciding to relocate HUD's headquarters to Virginia.

## II. THE COURT SHOULD ENTER MULTIPLE FORMS OF RELIEF

The Court should enter three forms of relief to remedy the harms to Plaintiffs: (i) set aside and vacate Defendants' relocation decision under 5 U.S.C. § 706(2); (ii) declare that Defendants' relocation decision is unlawful; and (iii) permanently enjoin Defendants from implementing the challenged decision.

*First*, the Court should set aside and vacate the challenged relocation decision. *See Maryland v. Patel*, 2026 WL 2389783, at *20 (setting aside and vacating FBI decision to relocate to Reagan Building). Because Defendants' decision to move HUD's headquarters to Virginia is contrary to law, the APA requires that the Court "shall . . . hold [it] unlawful and set [it] aside." 5 U.S.C. § 706(2). "To 'set aside' a rule is to vacate it." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quotation omitted). Thus, the D.C. Circuit has held that "vacatur is

---

[5] https://www.congress.gov/bill/118th-congress/house-bill/978/text.
[6] https://www.congress.gov/bill/115th-congress/house-resolution/38/text.

the normal remedy" when an agency's action is unlawful. *Id.* (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).

To "vacate" an agency action in this context means "to annul" it, "to cancel or rescind it," and to "render [it] void." *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983). Vacated agency actions are "treated as though [they] had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Statement of Kavanaugh, J.); *see also Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (once an agency action is vacated, it is "formally nullif[ied] and revoke[d]"). Accordingly, if this Court sets aside and vacates the decision to move HUD to Virginia, that decision would be rescinded, rendering it void and without legal effect. *See Action on Smoking & Health*, 713 F.2d at 797.

*Second*, the Court should enter declaratory relief under the APA and Declaratory Judgment Act that Defendants' relocation decision is unlawful, and that HUD must maintain its headquarters in Washington, D.C. unless and until Congress passes a law authorizing relocation outside the District. *See Maryland v. Patel,* 2026 WL 2389783, at *20 (entering declaratory relief that FBI's relocation to Reagan Building was unlawful). "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. A declaratory judgment is appropriate when the declaration would "clarify[] the legal relations" between the parties or "establish[] that [a party's] conduct" is unlawful, which would "ensure[] that [the party] cannot engage in similar . . . conduct" in the future. *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1367 (D.C. Cir. 2023). A declaration would serve a useful purpose here of establishing that Defendants' decision to relocate HUD's headquarters outside of the District is unlawful.

*Third*, the Court should award a permanent injunction against implementation of the challenged decision. *See Maryland v. Patel,* 2026 WL 2389783, at *20 (entering permanent injunction). A party seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Here, Plaintiffs "have shown that the [HUD relocation decision] will cause Plaintiffs irreparable harm by depriving them of the long-term, economic benefits associated with" maintaining HUD's headquarters at the Weaver Building. *Maryland v. Patel,* 2026 WL 2389783, at *20. "A loss of economic benefits" can constitute irreparable harm, *see id.*, particularly where, as here, funds "cannot be recouped" because of the federal government's sovereign immunity. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658 (2025). Plaintiffs have submitted declarations establishing that they have already suffered—and will continue to suffer—substantial economic harms due to the relocation of HUD's headquarters. *See, e.g.*, Cunius Decl. ¶¶ 4–6; Caltagirone Decl. ¶¶ 8–10; Shrestha Decl. ¶¶ 5–7. For example, Plaintiff Brown Bag's revenues declined 40% in the month of August compared to last year, following a decline of 33% in July. Cunius Decl. ¶ 4. The restaurant is no longer profitable, and if revenues continue to decline as projected, the restaurant will need to lay off one of its employees or go out of business entirely. *Id.* ¶¶ 6, 8. These are quintessential irreparable harms. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56 (D.D.C. 2025) (financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business"); *Mid-*

*Atl. Equity Consortium v. U.S. Dep't of Educ.,* 793 F. Supp. 3d 166, 197 (D.D.C. 2025) ("loss of experienced staff" constituted irreparable harm). Plaintiffs "cannot obtain . . . monetary relief even with a final judgment, because the federal government's waiver of sovereign immunity for APA claims does not extend to claims for monetary damages arising from such claims." *Maryland v. Patel*, 2026 WL 2389783, at *21.

The balance of equities and public interest also favor a permanent injunction. "When the movant seeks to enjoin the government, the final two . . . factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020). "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA . . . —that govern their existence and operations." *Id.* (citation modified); *see also C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) ("[I]t is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." (citation modified)). Moreover, if the HUD relocation is made permanent, not only will Plaintiffs lose the substantial economic benefits of having HUD located at the Weaver Building, but the entire area of Southwest D.C. in and around L'Enfant Plaza will lose out on those benefits. And if Defendants are freely allowed to ignore the Residence Act this time, nothing would stop them from moving other federal agencies outside of the District, imposing grave long-term harms on the District and its residents.

## CONCLUSION

The Court should grant Plaintiffs' motion for partial summary judgment on Count One and enter Plaintiffs' attached proposed order.

September 4, 2026

Respectfully submitted,

*/s/ Lynn D. Eisenberg*

Lynn D. Eisenberg (DC Bar No. 1017511)
Daniel F. Jacobson (DC Bar No. 1016621)
Benjamin B. Klubes* (DC Bar No. 428852)
John Robinson (DC Bar No. 1044072)
Nina C. Cahill (DC Bar No. 1735989)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, D.C. 20016
(301) 823-1148
lynn@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

**Of Counsel*